**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| **RICHARD OLIVE,** | ) |
| | ) |
| **Petitioner,** | ) |
| | ) |
| **v.** | )   **No. 3:17-cv-0979** |
| | )   **Chief Judge Crenshaw** |
| **UNITED STATES OF AMERICA,** | ) |
| | ) |
| **Respondent.** | ) |

**MEMORANDUM OPINION**

Sentenced to 31 years in prison and ordered to pay almost $6 million in restitution after a

jury trial, Richard Olive has filed a Motion to Vacate, Set Aside, or Correct Sentence pursuant to

28 U.S.C. § 2255 (Doc. No. 1). He claims trial counsel was ineffective during plea negotiations and

at sentencing. The former claim requires a hearing, the latter can be decided on the papers.

**I.  Factual Background**

The facts underlying this case are set forth in the Sixth Circuit's decision affirming Olive's

convictions and sentence, United States v. Olive, 804 F.3d 747, 750-52 (6th Cir. 2015), familiarity

with which is assumed. As a primer to place Olive's arguments in context, the Court simply notes

the following:

On March 1, 2012, a federal grand jury returned a nine-count Indictment against Olive  for

his role as the President and Executive Director of National Foundation of America ("NFOA"). The

Indictment covered the time period  from January 2006 until May 2007.

NFOA claimed to be a tax-exempt, non-profit organization, but was neither. Instead, NFOA

paid brokers a 9% commission – far above the industry average – to induce customers to transfer

their annuities to NFOA in exchange for an investment contract titled "Installment Plan Agreement." Those Agreements guaranteed fixed payments, but, as Olive well-knew, NFOA had far too few assets to guarantee the income in the amounts promised. Nevertheless, he represented that customers would receive the guaranteed income, misrepresented NFOA's tax status, and continued to operate, notwithstanding that cease-and-desist letters had been issued by several states.

Once the annuities were transferred, NFOA typically surrendered them, which led to financial penalties and a reduction in value. Over the course of its existence, NFOA exchanged customers' annuities worth approximately $19.3 million and surrendered them for $16.5 million.

The funds NFOA received inured to the benefit of Olive and his family, including his wife, and two step-daughters. Not only did each of them receive a salary, Olive also used NFOA funds to purchase a condominium in Las Vegas, Nevada, land in Tennessee, a Jiffy Lube franchise in Georgia, and an office condominium in Franklin, Tennessee. Funds were also used to lease luxury vehicles for both Olive and his wife, and to pay for a family vacation to New Orleans, Louisiana via a private jet.

In May 2007, the State of Tennessee took control of NFOA because it was undercapitalized, and the Indictment followed. After a six-day trial, the jury convicted Olive on all counts: three counts of mail fraud in violation of 18 U.S.C. § 1341; four counts of wire fraud in violation of 18 U.S.C. § 1343; and two counts of money laundering in violation of 18 U.S.C. § 1957.

A Presentence Report was prepared that calculated a Total Offense Level of 45, and a Criminal History Category II. This produced a guideline range of life imprisonment, but the statutory maximum for each wire and mail fraud conviction was 240 months imprisonment, and the money laundering statutory maximum was 120 months for each count. Run consecutively, this

would have resulted in a total guideline sentence of 1,920 months (160 years), which the probation officer recommended.

On August 9, 2013, Olive was sentenced by then-Judge Kevin H. Sharp to 36 months on each wire and mail fraud conviction, and 60 months on both money laundering counts. All counts were order to run consecutively for a total sentence of 372 months. Olive was also ordered to pay $5,992,181.24 in restitution.

## II. Legal Analysis

### A. Standards for Ineffective Assistance of Counsel Claims

Claims of ineffective assistance of counsel are governed by Strickland v. Washington, 466 U.S. 668 (1984). "'Surmounting Strickland's high bar is never an easy task'" because "[e]ven under *de novo* review, the standard for judging counsel's representation is a most deferential one[.]" Harrington v. Richter, 562 U.S. 86, 105 (2011) (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)).

To establish an ineffectiveness of counsel claim, a defendant must first show that counsel's performance was deficient: "[a]n attorney's performance is deficient if it is objectively unreasonable under prevailing professional norms." Hodges v. Colson, 727 F.3d 517, 534 (6th Cir. 2013). In this regard, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Strickland, 466 U.S. at 689. In fact, "[t]he Strickland Court held that petitioner must show 'that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment.'" Sylvester v. United States, 868 F.3d 503, 510 (6th Cir. 2017)

(quoting <u>Strickland</u>, 466 U.S. at 687).

Under <u>Strickland</u>, "a defendant must [also] 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" <u>Lafler v. Cooper</u>, 566 U.S. 156, 163 (2012) (quoting <u>Strickland</u>, 466 U.S. at 694)). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." <u>Harrington</u>, 562 U.S. at 105 (quoting <u>Strickland</u>, 466 U.S. at 694). "In making this showing, '[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding.'" <u>Sylvester</u>, 868 F.3d at 510 (quoting <u>Strickland</u>, 466 U.S. at 693). Rather, a defendant must show that "counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." <u>Id.</u>

Against this backdrop, the Court turns to Olive claims. First, he asserts that counsel "failed to properly advise [him] regarding the Government's pre-trial offer." (Doc. No. 1 at 4). Second, Olive claims that "[d]efense counsel ineffectively failed to preserve the Court's erroneous loss calculation" for appeal and, in any event, "'new evidence' exists in any event to further reduce the guidelines loss and restitution calculation." (<u>Id.</u> at 7). Olive requests an evidentiary hearing, although it is unclear whether this request is directed at one or both of these claims.

## B. Evidentiary Hearing and Plea Offer Claim

The decision on whether to hold an evidentiary hearing on a Section 2255 petition is a matter of discretion. <u>Huff v. United States</u>, 734 F.3d 600, 607 (6th Cir. 2013). Recently, the Sixth Circuit has summarized the guidepost used for exercising that discretion:

> An evidentiary hearing "is required unless the record conclusively shows that the petitioner is entitled to no relief." <u>Campbell v. United States</u>, 686 F.3d 353, 357 (6th Cir. 2012) (quoting <u>Arredondo v. United States</u>, 178 F.3d 778, 782 (6th Cir. 1999)); see also 28 U.S.C. § 2255(b). The burden "for establishing an entitlement to an

evidentiary hearing is relatively light," and "[w]here there is a factual dispute, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." Turner v. United States, 183 F.3d 474, 477 (6th Cir. 1999). A petitioner's "mere assertion of his innocence," without more, does not entitle him to an evidentiary hearing. Valentine v. United States, 488 F.3d 325, 334 (6th Cir. 2007); see also Turner, 183 F.3d at 477. But when presented with factual allegations, "a district court may only forego a hearing where 'the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact.'" MacLloyd v. United States, 684 Fed. Appx. 555, 559 (6th Cir. 2017) (internal quotation marks omitted) (quoting Arredondo, 178 F.3d at 782). "[W]hen a defendant presents an affidavit containing a factual narrative of the events that is neither contradicted by the record nor inherently incredible and the government offers nothing more than contrary representations to contradict it, the defendant is entitled to an evidentiary hearing." Huff, 734 F.3d at 607 (citation and internal quotation marks omitted).

Martin v. United States, 889 F.3d 827, 832 (6th Cir. 2018).

Olive's contention that counsel was ineffective during the plea negotiation process requires a hearing because the record does not establish he is not entitled to relief on this claim. What the record does show is the following:

Prior to trial, the Government offered to enter into a plea agreement, whereby Olive would plead guilty in exchange for a 9 year sentence. Olive asserts that, had he known he faced the 31 years imposed by Judge Sharp, or the potential 160 year statutory maximum, he would have accepted the plea. Instead, he relied on counsel's representation that the Guideline Range would be between 17 and 20 years imprisonment. Therefore, Olive rejected the plea offer because in his "mind – and given [his] age – he was willing to take the chance of winning at trial and accept the risk of losing and adding only an additional 8 to 11 years over the Government's plea offer." (Doc. No. 1 at 5).[1]    In support of his position that he was relying on trial counsel's calculation in deciding

_____

[1] Olive has also submitted a Declaration form his wife, Susan Olive, who similarly states that "[i]f Richard had known that the [sic] Mr. Nesland was wrong and that his exposure was greater than 20 years (and actually *160* years), I am certain Richard would have accepted the 9-year plea offer."

to reject the plea offer, Olive relies primarily upon an email in which counsel stated:

> You know from the sentencing memorandum I provided to you and our discussion that the applicable sentencing guidelines, if followed, *will result* in a sentence in the range of 17 to 20 years.

(Id.) (emphasis by Olive). Olive emphasizes "will result" presumably to downplay the fact that it was preceded by the statement that the 17 to 20 year guideline range would apply "if followed" by the Court.

Regardless, this lone statement bust be viewed in context. Elsewhere in the record it was made clear to Olive that the Government's projection of the Guideline Range was substantially higher and would result in a sentencing range of between 292 to 365 months, or 24 to 30 years.[2] This was made known to Olive via email from his trial counsel. (Doc. No. 13-1 at 4), and by way of a Memorandum that had been prepared by Investigative Resources, Inc. at the request of trial counsel (Id. at 10-14). Further, the plea offer letter provided to Olive specifically stated that it calculated the guideline range to be between 292 to 365 months, and that "this offense level is merely the government's estimate at this time, and the Court-determined offense level could be higher or lower if the case were to proceed to trial and then sentencing." (Id. at 7).

More troubling is Olive's assertion that he was not informed about the potential maximum sentence he faced if he chose to go to trial. This assertion appears to be confirmed by trial counsel who states that he did not inform Olive "that he could receive 31 or 160 years," nor did he advise him "that the sentence could be run consecutively." (Doc. No. 13-1, Nesland Decl. ¶ 6).

_____

(Doc. No. 16-1, Decl. ¶ 2) (emphasis in original).

[2] The difference in the parties' calculations was based upon whether a 2-level enhancement was applied for an abuse of trust, and whether 1 level would be added by grouping the money laundering and fraud counts.

"It is well settled that an attorney's failure to properly inform his client about his sentencing exposure may constitute ineffective assistance." Munson v. Rock, 507 F. App'x 53, 56 (2d Cir. 2013) (collecting cases); see also Wooten v. Raney, 112 Fed.Appx. 492, 496 (6th Cir. 2004) (noting that "in some cases the failure to inform a defendant correctly of his sentencing exposure at trial may constitute ineffective assistance of counsel"); Moss v. United States, 323 F.3d 445, 474 (6th Cir. 2003) (stating that " a failure to provide professional guidance to a defendant regarding his sentence exposure prior to a plea may constitute deficient assistance"). After all, "'[t]he decision whether to plead guilty or contest a criminal charge is ordinarily the most important single decision in a criminal case,'" and "it follows that '[k]nowledge of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty.'" United States v. Gordon, 156 F.3d 376, 380 (2d Cir. 1998) (internal citations omitted).

A defendant's claim that he would have pled guilty but for the ineffectiveness of counsel is obviously self-serving, Turns v. United States, 248 F. App'x 708, 711 (6th Cir. 2007), and a court "must exercise caution in ordering an evidentiary hearing, since it might encourage defendants to try to manipulate the criminal justice system to obtain the advantage of a trial with its chance of acquittal as well as the advantage of a plea with its lesser sentence." Griffin v. United States, 330 F.3d 733, 739 (6th Cir. 2003). Nevertheless, "[w]hether it is reasonably probable that [a defendant's] decision to plead guilty would have been different had he been properly counseled as to his potential punishment is a question of fact." United States v. Grammas, 376 F.3d 433, 438 (5th Cir. 2004); see also, United States v. Benson, 127 F. App'x 808, 810–11 (6th Cir. 2005) (collecting cases for the proposition that the Sixth Circuit "typically refrains from addressing" claims as to whether a defendant would or would not have pled guilty but for ineffective counsel because of "the

absence of evidence" in the record, and "appellate courts are not well equipped to undertake the resolution of factual issues").

Here, the record does not resolve the issue of whether Olive, in fact, would have pled guilty had he been informed about the maximum potential exposure he faced, and the possibility that his sentence could be run consecutively. Also unanswered is the factual question of whether he has suffered prejudice in the form of a reasonable probability that the outcome would have been different had he accepted the plea.

In Lafler, the Supreme Court was presented with the issue of "how to apply Strickland's prejudice test where ineffective assistance results in a rejection of the plea offer and the defendant is convicted at the ensuing trial." 566 U.S. at 162. The Court wrote:

> Having to stand trial, not choosing to waive it, is the prejudice alleged. In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

Id. at 163-64.

Whether Judge Sharp would have accepted a plea calling for a nine-year term of imprisonment is open to question. All the Court has before it at this point is anecdotal evidence.

Olive points to a NASHVILLE POST article titled "*Kevin Sharp: Why I Left the Bench.*" There, under the heading "on making changes from within the justice system," Judge Sharp is quoted as saying:

> At the district court level, it's really, really tough to do. I was on the bench for six years; I can count about five times an important case came through. The rest of the time, you're kind of cranking it out. A lot of it is theater on the criminal side. We're

8

going to go through the motions, you're going to plead guilty, and I'm going to sentence you and you've already worked out a deal.

(Doc. No. 16-2 at 4).

On the other hand, the Government argues that "it is highly unlikely that Judge Sharp would have accepted any Rule 11(c)(1)(C) agreement that called for a sentence [which] would have represented nearly a 60% downward variance from the applicable guideline range of 262-327 months." (Doc. No. 9 at 9). It points to two other white collar cases in which Judge Sharp rejected proposed plea agreements. In United States v. George, No. 3:15-cr-009, a case alleging the theft of $2.3 million from dozens of investors, Judge Sharp rejected an agreement calling for a 72 month sentence, and subsequently rejected an agreement calling for a 93-month sentence.[3] In United States v. Wilson, 3:16-cr-0047, a case involving the theft of between $750,000 and $850,000, Judge Ssharp rejected an agreement calling for the imposition of a sentence within the guideline range of 51 to 63 months.

Based on the present record, the Court is in no better position to answer the question of whether Judge Sharp would have accepted a 9-year plea deal for Olive's crimes, than it is to determine whether Olive would actually have accepted such a deal. These issues require a hearing.

**C. Amount of Loss Claim**

Olive's second claim -- that counsel was ineffective in failing to preserve for appeal the issue of  erroneous loss calculation, and his further assertion that the amount should be reduced based upon "new evidence" – requires no hearing. By way of background to this claim, the Court notes the following:

---

[3]  After the second agreement was rejected, Defendant absconded and remains at large.

Notwithstanding the Presentence Report's recommendation that the base offense level be increased by 22 under U.S.S.G. § 2B1.1(b)(1)(L) because the amount of loss was allegedly somewhere between $20 million and $50 million, Judge Sharp fixed the amount of loss between $2.5 million and $7.5 million, resulting in an 18-level increase to the offense level. In fixing those parameters, he stated:

> The offense computation using 2B1.1, the base offense level is seven, convicted of -- Counts 1, 2 and 3 were the mail fraud and 4, 5, 6 and 7 were wire fraud. They have statutory maximum term of imprisonment of not more than 20 years. The base offense level is seven.

> The specific characteristics in 2B1.1(b) in the PSR it applied L. Based on the evidence, I think that it's J[4] that applies. It's greater than 2.5 million. I think the evidence was more than sufficient for the application of that loss amount. And so there was an 18 point enhancement.

(No. 3:12-cr-00048, Doc. No. 127, Sentencing Transcript at 47) ("Sent. Tr. at ___"). After imposing sentence, Judge Sharp, in accordance with United States v. Bostic, 371 F.3d 865, 873 (6th Cir. 2004), asked whether the parties "ha[d] any objection to the sentence as stated." (Id. at 56). Apart from asking for a recommendation that Olive be placed in the Federal Corrections Institution in Miami, Florida, counsel voiced no other objections at that time.

On appeal, Olive argued that the amount of loss calculation was improper "because the district court failed to provide [a] sufficient rationale for its decision." Olive, 804 F.3d at 758. Because no objection had been raised to Judge Sharp's statements that "J applied" and "[i]t's greater than 2.5 million," the Sixth Circuit found this claim to be subject to plain error review. In Olive's view, counsel's failure to voice an objection during the Bostic inquiry constitutes ineffective

---

[4] This is a reference to subsection "J" of U.S.S.G. § 2B1.1(b) which, at the time of the offenses, provided for an 18 level increase where the amount of loss was between $2.5 and $7.5 million.

assistance of trial counsel. The Court disagrees.

As an initial matter, "the plain error and ineffective assistance of counsel standards do not necessarily generate identical outcomes with respect to the same alleged error." United States v. Carthorne, 878 F.3d 458, 466 (4th Cir. 2017). In other words, "the 'deficient performance' standard of an ineffective assistance claim will not always be satisfied by the failure to object to an obvious error," and "[c]ounsel may decide, for strategic reasons, not to object to an obvious error." Gordon v. United States, 518 F.3d 1291, 1300 (11th Cir. 2008).

As for the Bostic inquiry, a negative answer "is immaterial to the standard of review . . . appl[ied] in evaluating [defendant's] substantive argument[s]." United States v. Simmons, 587 F.3d 348, 355 (6th Cir. 2009); see also, United States v. Vonner, 516 F.3d 382, 386 (6th Cir. 2008) (observing that, while responding "no" to a Bostic question "did not undermine [defendant's] right to appeal issues he had 'previously raised,' it did undermine his right to challenge the adequacy of the court's explanation for the sentence"). That is, "[w]here the sentencing judge complies with [Bostic], the defendant generally forfeits the right to challenge on appeal any procedural errors to which he did not object at the time of sentencing [but] is not required to object to the substantive reasonableness of his sentence to preserve that issue for appeal." United States v. Penson, 526 F.3d 331, 337 (6th Cir. 2008).

Furthermore, not only must "'[j]udicial scrutiny of counsel's performance . . . be highly deferential,'" it "should be guided by a measure of 'reasonableness under prevailing professional norms.'" Sylvester, 868 F.3d at 510 (quoting Strickland, 466 U.S. at 688–89). "Counsel need not pursue every possible claim or defense in order to avoid a finding of deficient performance." Id. citing (Knowles v. Mirzayance, 556 U.S. 111, 123 (2009)). "'[O]nly when ignored issues are clearly

11

stronger than those presented, will the presumption of effective assistance of counsel be overcome.'"

Id. (quoting Monzo v. Edwards, 281 F.3d 568, 579 (6th Cir. 2002)).

Viewed from the perspective of reasonableness, trial counsel's failure to preserve the argument relating to the depth of Judge Sharp's findings was not deficient. Rather than focusing on that procedural argument, counsel chose to preserve the substantive issue, *i.e.*, that the loss was nowhere near that contemplated by the Government ($10 million) or the Probation Office ($20 million plus). Counsel did so by filing a 26-page sentencing memorandum (with supporting exhibits) in which he argued that the Court should impose a sentence in the range of 6 to 12 months because "[t]here was no intended or actual loss caused by the Offense Conduct, and, thus, no legal or factual basis to interpret and apply 2B1.1(b)(1)(L) and Application Note 3(A) to increase the offense level by 22." (Case No. 3:12-cr-00048, Doc. No. 95 at 11). Likewise at the sentencing hearing, counsel argued "there was actually no subjectively intended loss, no objectively intended loss and no actual loss, because the charge was that he did not have sufficient funds at NFOA to repay those installment contracts and that was never proved." (Sent. Tr. at 44). He also cross-examined the Government's witnesses in an effort to reduce the loss amount. Apparently, those arguments were not raised on appeal because, two weeks after the sentencing (and on the same day Judge Sharp clarified his earlier sentencing pronouncement), counsel was granted leave to withdraw and new counsel was thereafter appointed. "The Sixth Amendment does not require counsel for a criminal defendant to be clairvoyant." United States v. Harms, 371 F.3d 1208, 1212 (10th Cir. 2004) (collecting cases). Instead, "the constitution guarantees criminal defendants only a fair trial and a competent attorney." Murray v. Carrier, 477 U.S. 478, 486 (1986).

Regardless, and assuming counsel's performance was deficient, Olive must demonstrate

prejudice. In the context of sentencing this requires that there be "a reasonable probability that, but for counsel's errors, [his] sentence would have been different," Weinberger v. United States, 268 F.3d 346, 351 (6th Cir.2001), *i.e.*, "he would have received a lower sentence," Wilder v. United States, 2017 WL 4417859, at *1 (6th Cir. Mar. 23, 2017) (collecting cases). That showing cannot be made here.

Olive argues that, at trial, he "produced evidence that NFOA was solvent upon seizure, all countable losses occurred after receivership, and unforeseeable distressed real estate market forces influenced the liquidation." (Doc. No. 16 at 9). As a consequence, there was no intended loss. Olive also argues that "the unexpressed basis for the loss assessment [was] hidden within the sentencing judge's mind," (id. at 8), yet virtually the same argument he now makes was presented at sentencing and Judge Sharp made clear exactly how little he thought of the argument. In response to (1) trial counsel's argument that "there was actually no subjectively intended loss, no objectively intended loss," because it "was never proved"; and (2) his reliance on Olive's expert who testified about the actual present value calculation that showed Olive had sufficient assets to pay outstanding obligations, Judge Sharp stated:

> THE COURT: Well, that's not my recollection of it. My recollection of it is it was, and I'm not so sure that Mr. Olive didn't admit that, that if you froze – and I think I asked that question as well. If you – if everything freezes today and he doesn't bring in any more contracts, can he pay, I think he admitted, no, he could not. He didn't have them. And I'm certain that there was other evidence of that.

> \*                    \*                    \*

> THE COURT: Well, my recollection is that – I do recall that your expert said that. My recollection is that based on my questions about that, that there was an admission that there was not. However, the Government's expert clearly showed that there was a deficit, that there was not enough in the installment. And, frankly, Mr. Olive's word about what anything was not very high. He was at most – not a credible witness is being kind to Mr. Olive.

(Sent. Tr. at 44-46). Ultimately, "the way [Judge Sharp] saw it," there "was not sufficient evidence to cover" the obligations due under the Promissory Notes. (Id.).

"'The sentencing judge is in a superior position to find facts and judge their import under § 3553(a) in the individual case'" because he or she "see and hears the evidence, makes credibility determinations, has full knowledge of the facts and gains insights not conveyed by the record." Gall v. United States, 552 U.S. 38, 51 (2007) (citation omitted). Given Judge Sharp's statements during trial and at sentencing, only a small sampling of which is referenced above, it is simply unreasonable to conclude that he would have sentenced Olive to less time had he been requested by trial counsel to further explain the reasoning underlying the amount of loss calculation.

Nor, given the standard of review, is it reasonable to conclude that the outcome would have been different on appeal had the procedural issue been preserved. "Under the Guidelines, the district court is to determine the amount of loss by a preponderance of the evidence, and the district court's findings are not to be overturned unless they are clearly erroneous." United States v. Triana, 468 F.3d 308, 321 (6th Cir.2006) (citing United States v. Guthrie, 144 F.3d 1006, 1011 (6th Cir. 1998)). Utilizing this standard, the Sixth Circuit "'will uphold the district court's decision as long as it has interpreted the evidence in a manner consistent with the record." United States v. Bey, 384 F. App'x 486, 494 (6th Cir. 2010) (quoting United States v. Darwich, 337 F.3d 645, 664 (6th Cir. 2003)). "This means that, '[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.'" Id. Further, "[t]he fact that the appellate court might reasonably have concluded that a different sentence was appropriate is insufficient to justify reversal of the district court." Gall, 552 U.S. at 51.

In the Presentence Report, the actual loss to investors was found to be $5,929,181.24. This

figure was supported by an attached spreadsheet prepared by Paul Eggers, Jr., who served as the receiver for NFOA and liquidated its assets, and testified for the Government at trial. The figure was based on the difference between the accumulated value of the policies that NFOA exchanged (approximately $26.3 million), and the amount that the victims received from the distribution or other payments on their contracts by NFOA upon liquidation. The approximately $6 million dollar figure did not include the intended loss to the 190 victims of the scheme, that, as previously noted, would have increased the offense level by 22 levels according to the Presentence Report calculations, or by 20 levels based upon the Government's amount of loss calculation.[5]

Clearly, Judge Sharp was not persuaded by Olive's claimed lack of intent to cause losses, and he was fortunate that Judge Sharp did not find a higher loss given that, "[u]nder the Guidelines, loss is calculated as 'the greater of the actual loss or the intended loss.'" United States v. Vysniauskas, 593 F. App'x 518, 523 (6th Cir. 2015) (quoting USSG § 2B1.1 cmt. n. 3(A)). Instead, Judge Sharp fixed the loss as more than $2.5 million and less than $7.5 million, and agreed with the Presentence Report's assessment that $5,992,181.24 was the proper restitution amount. From this, as the Sixth Circuit noted on direct appeal, it can be "infer[red]" that the restitution amount was used "to determine the Guidelines' loss amount as well." Olive, 804 F.3d at 758. This is in keeping with the principle that "'[a]n award of restitution must be based on the amount of loss actually caused by the defendant's conduct.'" United States v. Rothwell, 387 F.3d 579, 585 (6th Cir. 2004); (quoting United States v. Liss, 265 F.3d 1220, 1231 (11th Cir. 2001)). Therefore, Olive cannot show that Judge Sharp clearly erred in fixing the amount of loss between $2.5 million and $7.5 million.

---

[5] This intended loss would have included the additional benefits Olive and his family received, such as salaries, and the commission payments Olive made to financial advisers.

Finally, Olive argues that "new evidence" exists to reduce the amount of loss calculation. In actuality, this is not an ineffective assistance of counsel claim because Olive makes no showing that trial counsel knew or should have known about those distributions prior to sentencing. Instead, Olive claims that, after NFOA was dissolved, "an additional distribution was made to the alleged victim-donor to further reduce the loss." (Doc. No. 1 at 10).

As for the merits of the claim, Olive relies on comment 3(E)(i) to U.S.S.G. § 2B1.1, but that reliance is totally misplaced. The comment states:

> (E) Credits Against Loss.--Loss shall be reduced by the following:
>
>> (i) The money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim before the offense was detected. The time of detection of the offense is the earlier of (I) the time the offense was discovered by a victim or government agency; or (II) the time the defendant knew or reasonably should have known that the offense was detected or about to be detected by a victim or government agency.

U.S.S.G. § 2B1.1, cmt. n.3(E)(i). Olive presents nothing to suggest that "additional distributions" were made to the victims before his scheme was discovered, and this claim also fails.

## IV. Conclusion

On the basis of the foregoing, the Court will hold an evidentiary hearing on Olive's claim that counsel was ineffective in failing to explain the maximum possible punishment he faced if convicted after trial and/or by failing to inform him that any sentences could be run concurrently. Olive's claim that counsel was ineffective at sentencing because he failed to assert a Bostic challenge to the amount of loss calculation, and his additional claim that "new evidence" exists to reduce his sentence will be denied.

An appropriate Order will enter.

_____

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE